The Honorable Justice Sharon O. Johnson presiding, case number 22-0918, People v. Tierra Graves. Good afternoon, and welcome to the Illinois Appellate Court, 1st District, 6th Division. I'm Justice Sharon Oden-Johnson, and I am joined by my colleagues, Justice Michael B. Hyman and Justice Carl Anthony Walker. Counsel for Appellant, please state your name and appearance for the record. Good afternoon, Your Honor. Erica Mayle for the Appellant, Tierra Graves. Thank you, and Counsel for the Appellee, state your name and appearance for the record. Good afternoon, Assistant State's Attorney Lisanne Pugliese appearing on behalf of the people. Very good. You'll each be allowed 20 minutes in order to make your presentation, with the Appellant having the opportunity to reserve time for rebuttal. Attorney Mayle, would you like to reserve any time for rebuttal today? Yes, Your Honor, I would. How much? Five minutes. Very good. You may begin. Thank you. May it please the Court. Tierra Graves was convicted of the first-degree murder of Marilyn Duffy, and she testified that she acted in self-defense when she fired one shot after a lengthy argument. The State failed to prove that she did not act in self-defense, and it at most only proved that she had an unreasonable belief in the need for self-defense. Can you speak a little louder? Yes. Furthermore, her trial was flawed, where she could not prevent a full defense due to the trial court's rulings that barred evidence of her state of mind and of Duffy's violent character. The prosecutor misstated the evidence in closing to negate Graves' defense, and the trial court failed to ensure that the jury presumed her to be innocent. Now, starting with the argument in Issue 1A, even in the light most favorable to the State, here the State has failed to prove Tierra Graves guilty beyond a reasonable doubt that she did not act in self-defense. The physical evidence is consistent with Graves' testimony that she acted in self-defense, and the State did not present any evidence that Graves started the physical altercation. Can we jump to, there's a line between where the decedent was the aggressor, they were in the apartment, but then the tides kind of shifted, and the decedent leaves the apartment. And it could be said that the defendant then became the aggressor because the defendant then followed later down outside of the apartment to the neighbor's home, where the decedent was. So why was that shift from self-defense to now the defendant being the aggressor? At the time that Graves went downstairs, the eyewitness testimony from the neighbors is that the argument continued to be verbal, that they were arguing outside of the apartment. There's no testimony from those eyewitnesses that Graves showed her weapon or was physically aggressive. The matter is in terms of who is the initial aggressor, who initiated the physical altercation, and the evidence is consistent with Graves' testimony that she was on the stairs retreating from this continual argument when Duffy pulled her down the stairs. So while she did go downstairs, that was after police had failed to respond to the 911 call, Duffy had continued to threaten to do physical damage to Graves' car. Again, her going downstairs was not being the initial aggressor in the physical altercation that didn't happen until Graves was retreating back upstairs. Based on the evidence though, Ms. Mill, what was the reason that she actually went downstairs? I know that the, I believe the fish tank had already been destroyed and she had already at least brandished a knife. What was the reason that Graves went downstairs? Her testimony was that she went downstairs to try and resolve the argument since Duffy had continued to, I think, knock on the door, threatened to do damage to Graves' car that was outside. Graves expected police to respond and I believe they had not responded. And that was after about 50 minutes that the 911 call had been made, is that correct? I believe her testimony was about 40 minutes, there hadn't been a response. And so I believe Graves testified that she went downstairs to try and resolve the argument rather than to continue to prolong it. And then, so after that, and still on the same line with what Justice Johnson was asking. So then Graves started going back upstairs to her apartment and the alleged victim then followed her and then at some point grabbed her, is that correct? Yes, and wrestled her down the stairs. And again, the physical evidence is consistent with that. The fired cartridge was located on the stairs rather than in front of the apartments of the neighbors who testified that their verbal altercation was happening outside those apartments. But again, Graves' testimony was that she was retreating back upstairs when Duffy wrestled, pulled her down the stairs. And that's consistent with where the fired cartridge was found. Right, and they were cousins. I'm sorry, Justice Johnson. They were cousins, and there was some homelessness involved. So Graves allowed her to come and live with her so she wouldn't be homeless. And Graves also had a young son, which was, I don't remember the exact age, probably somewhere around seven, eight years old is what it seems like. And the Graves also at that point knew that the victim had the knife, because I believe the knife was even found in her purse subsequent to all of this. It's not clear whether or not the knife was shown at the time Graves fired the shot. But there had already been the altercation with the destroying of the fish tank in the apartment prior to all of this. And that's where you, with all of that, that's where you kind of go with your self-defense theory, correct? Correct. Okay, I think Justice Johnson has a question. But at some point, I want you to kind of tell us where you believe the line was drawn between self-defense and second-degree murder. But I think Justice Johnson has a question first. Okay, well, it's still kind of along the same lines. First, I recall reading some language that it was a tug versus tackling or pulling down. So where did this language that it was a tug on your client's leg come from? I believe the state characterized it as a tug in its closing arguments. Tierra Graves testified that she was being pulled down or wrestled down the stairs. I think the tug language comes from the state. Now, to return to Justice Walker's question, to make sure I want to respond to what you were asking, you were asking about the line between reasonable belief in the need for self-defense and unreasonable belief in the need for self-defense. Is that correct? Correct, yes. Okay. I think here where Duffy had already threatened Graves with a knife previously, where Graves knew that Duffy still had that knife on her, which was consistent with what was found, Graves testified she didn't necessarily see whether or not she had the knife out, but she did know that Duffy had the knife still with her. I think there it's a reasonable belief that she's in imminent danger of death or great bodily harm, where someone who's threatened her the same evening still has the weapon on her. Where the line between unreasonable and reasonable may be in how much, and again, the fact that Graves did not see a weapon, again, I still think it's reasonable that she knew that Duffy was armed, but perhaps the line may be where she hadn't seen the weapon. Again, they're still on the stairs, though, and being pulled down is in danger. Can you also address the allegations that Graves told others, made at least two phone calls indicating that she was going to kill the decedent? The testimony regarding the call to Graves' mother, Ms. Rogers testified she said she was going to shoot my daughter if she ran up on her, and clarified that meant getting in her face. I would argue that that indicates that Graves did believe she was in danger, and that Duffy was a threat to her. The statement is that if Duffy attacked, that she was concerned about that. The call, while the state characterizes intent to shoot her, I think it's actually consistent with her belief about Duffy's dangerousness, which to turn to issue two, I think the court's rulings on evidentiary issues actually prevented Graves from presenting evidence of her state of mind and of Duffy's violent character that would be relevant to her belief that she was in danger and what she knew about Duffy's character. First, the trial court barred the 911 call that the recording of the 911 call that Graves made during the argument, and this was evidence that was relevant to her state of mind, which is probative of her belief in the need for self-defense. That call occurred in the middle of the argument, and now regardless of how she sounds, the state has characterized her as sounding calm. I might characterize that differently. It was for the jury to decide what her state of mind was, and this was evidence that was particularly relevant to that. Any concern that the jury might use that for a different purpose could have been addressed with a limiting instruction that it was only to be used to consider her state of mind. Now, Judge Sachs ruled that the call was not admissible because it was self-serving hearsay, but that's not a recognized grounds to exclude otherwise admissible hearsay. Let me ask about first, you're asking for reverse outright. Regarding issue 1A, yes. 1A, and you mentioned several things. What case would you say this most clearly relates to for precedent? Regarding the reversal outright? Yes. Okay. I would argue it most closely resembles people versus white, where similarly there was a history of an argument even that evening, and the defendant there was not required to have inerrant judgment, and that previous argument is relevant. I would say people versus white is the case that's most relevant to the outright reversal. Also, the words that were used by Graves was if she ran up to her, right? If she ran up to her? She never said anything about being in somebody's face, correct? I believe I can clarify. That was testimony. The testimony was they asked what that meant to the witness, and the witness used the word in your face, but that wasn't the words used by the defendant. That's correct, yes. Okay. All the defendants said they're going to run up. Now, what is the general – I mean, there's a dictionary understanding. What is it for run up? What does that mean? I think in context it sounds to me like some sort of attack. I don't know that I have a dictionary definition of run up as a colloquial phrase in front of me, but I think it suggests some sort of attack. Okay, and getting in somebody's face? Again, some sort of – to me it sounds like some sort of physical perhaps altercation of some kind. So you see those things as being equivalent or not? Again, I think based on the defendant's words to Duffy's mother, the indication is that she is, you know, worried that Duffy's going to attack her in some way. Physically attack her? Yes. So if she was physically attacked, she'd have to defend herself is what she was saying? That's how I would read that statement. That's your position, okay. Yes. The next question would be then when she was on the stairs and Duffy put her hand on her, right? Hold her, yes. So that's when the shooting occurred. So there was a physical act. Correct. That's consistent with what she had said. If there was a – if she ran up on her. Yes, I would say, you know, there was a verbal argument. It was the testimony of the neighbors was that it was not physical when they were just verbally arguing that Duffy – There was a knife scene in the apartment. Correct. I don't want to sell that, but in the apartment. Right. Duffy had threatened her – threatened Graves with the knife. There was no testimony that she had actually attacked her with the knife but had threatened and had had it out. To return to some of the evidentiary issues. Before you do that, I just wanted to go back to White. Wouldn't you say that that is factually distinguishable? In White, the decedent came to the defendant's apartment building, approached him, he was told to go home and did not, and he approached the defendant brandishing a knife before being shot. In this case, the decedent, Duffy, had removed themselves from the scene, essentially, and the defendant then went to where Duffy was. My response would be similar to regarding coming downstairs as a sign of aggression. The argument by the neighbor's testimony was that still a verbal argument when Graves came downstairs and the shooting did not happen outside of those apartments. I think where it's similar to White is that Duffy was the one who pulled Graves down and Graves didn't respond by even showing that she had a weapon when the argument was just verbal. It wasn't until Duffy physically pulled her down the stairs that she responded with any kind of force. With White, I think the decedent returning to the apartment is similar to Duffy going after Graves when she's trying to retreat back upstairs. When you say she was going upstairs, do we know that her body was positioned? We know she turned around to shoot. We know that from the evidence. But she was walking up the stairs. She wasn't looking behind her. Do we know whether she was surprised by somebody tugging at her? She's going up the stairs. She's getting away from the situation. And then she feels this tug, right? So she didn't know what was going on behind her. Or does she? I'm not sure there's testimony specifically on that point. But I think the testimony did not seem to imply that there were no other eyewitnesses that were called. I don't know that there was anyone nearby that it could have been someone besides her. But Graves' testimony, does it indicate that she was surprised or taken aback or she wasn't expecting? Certainly. And she testified that she was afraid and, you know, she didn't believe she was going to be stabbed because she knew Duffy had a gun. To return to some of those evidentiary issues, though, the trial court's rulings also prevented Graves from presenting some of those. Wait a second, Ms. Mill. Before we go into the trial court's rulings, I want to just make sure we're clear on these other evidentiary issues. In White also, White had already been stabbed by the alleged victim prior to the shooting and prior to sort of the second incident where the shooting actually took place. You recall that, correct? So that makes White a little bit different too. So I want you to kind of address how we need to look at that. But then I also want to point out, and you just pointed out again, Graves was actually retreating at the time that she was grabbed. She was going back into her own apartment, which of course, Duffy lived there as well, but Duffy only lived there because Graves allowed her to live there to prevent her from being homeless. So, but go ahead. I'll let you respond to that for a second. How White is not different in that respect. On White, I actually, I think it is connected to some of the evidentiary rulings in that the trial court prevented Graves from presenting some of the, some of what she knew of Duffy's violent character. So I think it is relevant that the jury may not have heard everything it could have related to what Graves knew of Duffy's violent character. And just really quickly of that, Duffy had already been convicted of battery and assault and so forth. And Graves knew that, her cousin knew that even when she allowed her to come and live with her. Correct? Correct. But the jury didn't get to hear that that battery conviction was on Duffy's mother. I can get to that in a bit, but I, while the White argument does include that the decedent had, had stabbed earlier, the, you know, in, in this argument based on the testimony that was presented at trial, Duffy had already threatened Graves with a knife earlier that evening. And again, the relevance to her belief about how dangerous Duffy was, I think that's, that does actually make it similar to, similar to White in that. I think this is a good time too, for you to mention though, that the fist tank was destroyed. Was that a punch or how does she destroy it? Did she actually punch it with her bare hands? I believe the testimony is that she punched it. She also seemed to be getting some treatment from the, or getting some like hydrogen peroxide from one of the neighbors, perhaps related to having punched the fish tank. So again, she's, while in White, I think the stabbing was significantly earlier in this case, the, the violence that Duffy had used already that evening, in both physical damage to the fish tank and the threat of stabbing Graves is relevant to what Graves believed then when she was on the stairs trying to get back to her apartment. Yeah. And I know we're spending a lot of time on the facts here, but it's because if, when you're looking at this whole thing with the second degree murder versus self-defense versus first degree murder, it, it kind of, I mean, it's, it's really fact intensive as to what was really going on. Yeah. And, you know, so if there's any other information that you have that you can share with us that, that, that, you know, you believe the jury didn't hear, we'd like to hear that. Yeah, I will. Before we get to that, what the jury didn't hear, how about something the jury heard and how that affects your argument. And that is that after the stabbing, Graves goes back to her apartment, lies down on the couch and then starts cleaning up from the fish tank. She has a gun there, police come, she's very cooperative. She tells them where the gun is. I mean, she didn't act as somebody who was in fear of the police at that particular time. I mean, her actions after the fact, how, does that come into your argument that we've been talking about? I would say that, you know, she, her actions in returning to her apartment are certainly consistent with her trying to remove herself from the situation. I, I wouldn't particularly say that her actions afterwards are in any way incriminating. I, I, I, particularly given the stressful situation, she didn't evade the police in any way. She didn't, she cooperated. If anything, I would say it's consistent with her having fired only in self-defense. And she knew the police were coming. Correct. She had been waiting a long time to get there. And well, I don't know if she still believed that they were coming at that point, but she certainly, I think there's no reason to believe she expected them not to show up after that had happened. So I would also point out that that physical evidence that, you know, that she was cleaning up the fish tank is consistent with her account throughout the evening that Duffy had been aggressive and had been threatening force against her, but to turn to some of the evidentiary issues of what the jury didn't hear, there was the 911 call. So I'm going to ask you to give us the abridged versions of those because you are long, your time has long expired. And we think it'd be a peculating additional. Let me put the question a different way. Is anything you want to add that's not in your briefs or emphasize that in your brief rather than, cause we've read your briefs. Yes. I would only, I would point out that, you know, the state doesn't dispute that either the testimony of Duffy's mother or Duffy's father would be Lynch evidence. I think the jury, in order to understand her, both purposes of Lynch evidence are, are relevant here. Regarding the prosecutor's closing arguments, I would, I would point out that the this invented distance that they were five feet apart goes directly to the imminent danger. And so it negates both first and second degree murder. And I, I think that's particularly damaging where that, that distance of five feet that they continually relied upon was not in evidence. And finally, the, their, the violation of their, where judge Sachs failed to adequately explain the presumption of innocence here, I think is particularly damaging where graves was pleading an affirmative defense. So there was no question about the conduct, but the jury was required to still presume her to be innocent, even where she admitted to that conduct. So while any defendant is entitled to a jury that understands and accepts the presumption of innocence here, I think it's particularly damaging where, where judge Sachs failed to ensure that graves jury understood that. Okay. Thank you very much. You did reserve five minutes for rebuttal. So we'll allow the appellees council to present their argument at this time. May it please the court that people prove defendant guilty beyond a reasonable doubt of first degree murder. When the evidence is viewed in the light most favorable to the prosecution, it shows defendant did not have an actual belief, neither reasonable nor unreasonable and the need for self-defense when she shot the victim. This evidence and the reasonable inferences drawn from the evidence show she killed the victim because she was fed up and she was angry at the victim. Well, where does it say she was fed up? Where's that? Where do you get to? Well, defendant admitted in her testimony that there had been friction for two months with the victim since she had moved in. So there was friction. Well, there's friction. There's yes. There's some conflict between them. Then she was upset that there was, she found a condom that day in the house because she had a young child. She then was upset from everything that happened that evening prior to the shooting that happened up in the apartment. I mean, it's, it's, well, but, but you're, but she wasn't the one that did anything. She didn't start anything and that the knife that she was shown in the apartment, but came from great from a Duffy, not from a graves, didn't have anything, didn't do anything physical, didn't show any weapons. Is it correct? Up in the apartment in the initial, yes. During the initial, all those altercations, the defendant was frustrated. I think she was frustrated. The police didn't come. She kept calling the police. She was frustrated the victim wouldn't leave her apartment. It's I don't think that's a stretch and it's a reasonable inference from everything that was happening in her actions that she was, there was friction between them. And she was upset. She told, she told Rogers if she gets come on, if she runs up on her again, I'm going to shoot her. That doesn't say that. Well, let's run up me. Well, I think we have to go with what's in the record. And based on the conversation, the full conversation she had with defendant, that was Roger's interpretation of what she said that she said it would get in her face. And that's exactly. I mean, the words were run up. They weren't getting your face. So that was Roger's words, not the defendants. Correct. But even so she said, if she runs up on me, I'm going to shoot her. What does run up mean? I would say that run up was for the jury to interpret and to infer from the language, what she meant based on not only her words, but her actions throughout the night. Does run up mean a violent action? I don't think it necessarily means a violent action. Run up could be if you come up and talk to me, if you get in my face, if you argue with me, like you've been doing all night, I'm done with you and I'm going to shoot her. That's what she told her mother. She did not tell Rogers. I am afraid of her. She, I'm afraid she's going to stab me. If she threatens me with that knife again, I'm going to shoot her. She just said if she run up on me and Rogers interpreted from that conversation, it meant if she got in her face. No. Well, let's start with, would you agree that run up is a slang? Yes, I would say so. And it's black slang? I don't know, to be honest. Is it white slang? I don't have any basis for the slang term. Honestly, I don't have any interpretation. That's my question. Okay. Thank you. And I would, I would honestly say that was a question for the jury. It was a question for the jury based on this evidence, what they inferred that to mean and, and decide that for themselves. But even, even going past those words, which I think are very telling here, we have defendants actions. And as justice Johnson pointed out early, this earlier, this defendant, this was 40 minutes between the last time to call the police and the shooting. At this point, the defendant was up in her apartment and the victim was downstairs for at least 10 minutes or more before the defendant decided to continue this, not just sit there and wait for the police, which would have been perfectly fine. She wanted to, she escalated it and she was told by the victim that she was going to mess up her car. Now that she worried about her car and that's why she went down there. Well, if you're sure she was worried about her car, but honestly if you're that afraid of someone that you think they're going to stab you, are you going to go approach that person? And how scared was she of the victim? Not only did she have her living with her and her young son, but she approached her after she's allegedly so afraid. There's a lot of witnesses to that, but there were a lot of witnesses when she approached her, right? We have all the testimony of people seeing them together and everything else outside and nothing physical. When we have all that, the only time that we don't have any witnesses is on the stairway when she's up there from behind. Otherwise it was all over in public, which is a very safe situation. No, no, no gun was drawn. No knives were drawn. They were just having an argument about talking this over in public. So the next step, which was inside and she's going back to her apartment. She's deescalated, isn't she? By going back to her apartment. She's on her way. That's assuming the jury believed her version that that's what she was doing just because the cartridge was found on the stairs. Doesn't mean she was retreating. Just means that's what she was standing when she shot the victim. So that was again for the jury to interpret what that evidence did mean. At that time, I think that we look at the victim was in the base, was downstairs. Defendant was upset. She got the gun. She armed herself at that point and she approached someone she allegedly was so afraid of and started this conversation. And the, and yes, at the beginning people were watching and they're waiting to see if this was going to be a fight and it didn't seem like a fight, but just seconds or minutes. I think after these witnesses went inside, that's when the defendant shot the victim. And I think. So do you agree that leading up to the point where the descendant left the defendant's apartment at that point, had she shot her there, had Graves shot Duffy there at the apartment, that it would have been self-defense. Do you agree with that? I think we would have to flush out a little bit more of that because I haven't, I think all you have there is a threat with a knife. If I remember correctly, she waved it at her. I don't think she approached her. I don't think she was coming towards her. Well, she punched the pole in the wall, broke the. Right. But do you get to, do you get to shoot someone and kill someone because they broke your damaged your fishing? I don't think so. Right. Well, it goes to your believability or reasonableness of your belief of being an imminent danger. Yeah, it could play. I'm sure. Yes. It could play into it that she was being aggressive at that point, but you still have to have some unlawful force against you. Right. That has, and then you have an imminent for imminent danger. And so you'd have to look at whether she was an imminent danger of being stabbed at that point. And I would say, I don't, I guess I would have to be flushed out a little more, but based on the record, I would say not necessarily, but I see, I think, I think certainly the tides turned when the defendant armed herself and sought out the victim and didn't choose to wait and end this confrontation. I think that's very telling. And I think after the defendant's behavior after it's our position that does show that the jury could have used that and looked at those circumstances as evidence of guilt. If she really shot her in self-defense, she didn't try to aid or help her. She just fled up to her. She just fled up to her apartment. She didn't call an ambulance. I think if you call an ambulance, let's say someone shot and dying on the ground, that's, it's a, it's another reason to give the police a call. She also called the victim's mother after again, she didn't say, I just shot your daughter. She was trying to stab me. I was so afraid of her. All she said was I shot her and boasted about what she did. It's very clear from these facts about what she did. That was your commentary. I just said, she, I, she said I shot her. That's all she said. But you said it was a bonus. Well, I would, I can think I would characterize that. She didn't apologize. She didn't say why she did it. She just stated that fact. I think that's a fair inference. I mean, you may disagree. I think we have to be careful with inferences because I was concerned about this continued reference to four to five feet away during the shooting. And, you know, I think that we have to be careful to be accurate in our recitation of the evidence and the facts. And, you know, it certainly goes to credibility as well as to, you know, whether or not we can trust what's, you know, put in a brief or argue. So we have to be careful with that. And that was, I was certainly concerned about that because I thought, you know, if it's a struggle and self-defense, you're not necessarily going to stretch your arm out, which then gives those extra feet that have, you know, been added on to this, you know, fact scenario. Would you like me to address that? Yes. Okay. Thank you. So I, yes, I think here what the state did was they didn't present this as fact. The state very clearly explained to the jury what the medical, oh my God, I'm blanking on the word, but the medical testimony showed that it was at least two feet away. And then, you know, a jury comes to these, comes to trial, and they can use their own common sense, their own knowledge, any experience they have with guns, any experience they might have regarding how people shoot. So they could have come up to any of these inferences on their own. What the prosecutor did was merely remind them and stated, you may use your common sense. You may use your common sense. You've seen gangster movies and you've seen how, you know, how people shoot. Use your common sense and you look at it. How would someone shoot in this situation? And I think it's important to also note there was really no testimony that this was any wrestling at all, or that there was some back and forth wrestling. All that was said was she was, and I don't have the exact quote, but I think she said pulled or I was pulled towards, pulled downward, but she never fell. She never was injured. She never claimed to be. It's not a wrestling. So, you know, I think it's reasonable for this jury to infer that it, that this did not, this tug did not happen because she was too far away. I just think that her whole explanation of how this occurred was incredible. And I don't think that the prosecutor was out of line here. I think it was within bounds of proper argument to urge the jury to use that common sense. I guess the, how this becomes first degree murder versus a second degree or, you know, imperfect. Yes. So we established first degree murder because we established that the defendant's own words and her actions refute any notion that she was afraid of this victim. And instead that she went down and she became the aggressor, she brought the gun, she sought her out. So I think all of that refutes any notion that she actually was. I think that's exactly what does refute it. Doesn't it? The fact that she brought a gun that refutes it. She knew that the victim had a knife in. And so she was afraid. Absolutely. Doesn't it? Well, I think she, she, she brought a gun because she. Well, yeah, she, I think you can say she brought the gun because she had in her mind this happened again. I'm going to shoot her, but. Well, she didn't say it happened again. She said, if she had a runoff. If she got, if she ran up, if she ran up on me again. Yeah. But again, if you're so afraid of someone and she was in the apartment, she could have waited for the police. Yeah. But let's do that crucial stage here. And the most crucial stage is, is as the, as Ms. Graves is walking up the stairs, Duffy comes up behind her. And why don't you tell us, as you understand the facts, what do you believe happened at that moment? Well, initially our position is that I'm sorry, what. I said, based upon the evidence that that was the trial. Yeah. Yes. Based upon the evidence, our position that that tug never even occurred. And that was based on the defendant's statements and her actions before and after she became the aggressor. But even if you want to look at the tug and, and, and let's, you know, I'm not conceding it happened. If we see that the tug occurred from defendant's testimony, all that happened was she was going up the stairs. The victim came behind her and didn't wrestle her down the stairs. She didn't fall down the stairs. She didn't say she even fell off the one step. So there's some kind of touching. We don't know if it was her clothing. We don't know if it was her arm. We don't know. Could have just been tugging at her shirt. There's really no evidence there was wrestling. First use this reference to it as a tug. I'm going to say, to be honest, hold on one second. Counsel indicated that the testimony was that she pulled her, you know, down, down the stairs or grab. It was certainly more than a tug. I don't know if the testimony is that she actually. Let me read what she said. Oh, that'd be great. Thank you. It's record six 50. So, you know, graves said I felt her grab me, wrestling me, pulling me towards her. Which would be pulling her down the stairs. Cause she would definitely would have been at a lower point of the stairs than grace. Right. She didn't say she fell down the stairs or anything though. If you're pulling, you know, if you're pulling towards. Pulling her down the stairs is what it was though. That's what it sounds like from the testimony that was just read. Pulling me towards her. So that would be down. I don't know. I would enter. I just interpreted that differently. She didn't say she fell down the stairs or she was went to the bottom. If you're being, that's just my interpretation. But even if you want to say that, that there was, she was pulling her towards her. I would say that's not enough to combat that with deadly force. Right. So you, when she didn't even say it's more than a tug. I think later on when she was asked and she, when she was asked perhaps on cross examination, when you were tug, she kind of agreed to that. I think that's where the term came from. To be honest. Grab wrestling. I mean, which is much more forceful than a tug. Now that, that the, the prosecutor might use the word tug. I understand that, but that doesn't mean that she agreed with it just because she, she heard the word he used the word tug or she, but the words were grabbed me, wrestling me, pulling me. Those are the words. Okay. So pull. Yes. Pulling me fine. She didn't say she fell down the stairs. She didn't say she was pulled with such force that she fell. It was, she was pulling towards. You have to fall in order to, to, to. No, no. But I'm just saying if you could be pulled, but it might not be, you know, you're not in fear of getting hurt from that. Right. And she certainly wasn't. She did not have a knife. She did not have a knife. She didn't know she had a knife. She thought she had a knife. Well, that's why it could be. So that self-defense. Actually, she did. The knife early in the evening. She knew she had a knife in her purse. No. Well, there's not. I don't think there's any evidence. She said she had it in her purse. Upstairs. She just said she pulled a knife on her. So. They're really as far as I'm concerned. I don't think there's any evidence in the record that she knows that's where she keeps her knife, or it's always in her purse or any reason to think. That it was still with her. I don't think it was.    I think she did find it. 40 minutes later when she was shot. Find it in her purse when they arrived. So. Oh, right. I'm just saying she didn't know that for sure. While she had it. It was also clear from the evidence. It was never out. Because. She had been threatened with a knife. Let me read. Okay. Let me read this. 60. Because that's what. This is. Words. She did not know if the knife was in or out of the purse. When she was going up the stairs. Right. How would she have known it was in the purse at that point? She hadn't seen her for 40 minutes. So that's what I'm. So. It's not the issue. The issue is. She didn't know if the knife was in or out of the purse. When she was going up the stairs, she just turned in fear and fired. Right. Our position would be if you are being pulled from behind. You don't get to have a right to turn around without looking. Without any verbal threat. Without any, without feeling a knife. Without seeing a knife that you could aimlessly shoot behind you. And shoot the person with a gun. In response to being tugged. So. Whether or not she was 30 minutes, 40 minutes later was threatened. We've already gone through this. I'm sorry. I can't use it. I'm sorry. But she was pulled. Then that is not reasonable self-defense. And I would say it's not unreasonable self-defense either. Based on these circumstances. And especially in light of her, her language that she used beforehand to Rogers and her intent on killing her. So I would say it's not reasonable self-defense. Under these circumstances. Can you address the. Lynch evidence and jury instructions. Which was the jury instruction. Oh, I'm sorry. Yes. We're running out of time. Okay. I'm so sorry. So as far as the jury instructions and the, their principles. The people would, I'll try to be brief. We would just stress again. What's in our brief defendant. The judge was not required to give a specific script or any precise language, or even any further elaborate. Explanation of presumption of innocence. So based on what was said here, he referenced that principle. And it's clear the jury did not have any misunderstanding or confusion because nobody raised their hands when he asked if anybody didn't understand or accept these principles. And I think when you read it in context, it's very clear. What the judge was saying and that, and the, the record refutes it, because the jury did not, nobody raised their hand and saying they had any confusion didn't understand or accept those principles. And as far as the lynch evidence, specifically regarding the nine one one Paul, we need to look at them. Again, this is a standard of review here as abusive discretion. Here. It was not the trial court in his discretion. Listen to the audio tape. And in his interpretation. Under these circumstances was not arbitrary, fanciful or unreasonable. The, and this court has heard the tape as well. There was no crying. There was no being upset. There was no expression of fear in that tape and the court within its discretion properly left that out of the trial here. Do you have any other specific questions on lynch or would you like me to, am I out of time? If you'd like to make your concluding statement. Of course you can. For these reasons. And those contain the people's brief. We would ask that this court affirmed defendants conviction and his sentence, and I'm sorry, her sentence. Okay. Thank you so much. Attorney mail rebuttal. Yes. Just a couple of points. On on the knife. There was a little back and forth there about what graves knew about the knife. It was her testimony. That she knew at that time that Duffy had a weapon. That wasn't that was the knife and that graves testified. Where did the question was, where did you believe that knife was? Graves testified in her purse. So the, the grave's testimony was that she knew Duffy had the knife at the moment that that happened on the stairs. I, I would return to the closing argument again. The the state has not stated. The state argued that that was an invitation for the jury to use its common sense after understanding the evidence, but the, the state in clothing did not repeat the medical examiner's testimony that the shot came from less than from no less than two feet. It instead repeated that five feet, that five feet multiple times as a way to say that graves could not have been in imminent danger. And again, with the, with the Lynch evidence, graves was not able to present evidence of why she would have feared that Duffy was the Duffy was dangerous. And the jury didn't get to hear that Duffy had a conviction for being violent with a family member, with her mother. The state also argued that the explanation of the presumption of innocence was clear in context. I would actually argue that reading the, the trial courts explanation is for is even more confusing. And perhaps implies that graves is guilty rather than informing the jury that asking the jury,  I don't want to go over my time. If there are any other questions, I do have a question. Yeah. So I believe you argued earlier and in your brief that the defendant indicated that she left her home to go to the first floor where Duffy was to work it out. But also because she was concerned that, you know, Duffy stated that she was going to do some damage to the vehicle. Yeah. Mike, I guess my question surrounds self defense, but actually the defendant was defending property as opposed to, you know, she was safely in her home, but decided to leave to go and protect the property, not in, you know, defense of herself. And so can you talk about that a little bit and why we should, you know, I guess discount that her real reason for going downstairs was because she was attempting to protect property. I, um, I, I don't, her testimony, you know, her testimony is is that she was afraid at the moment that she fired that shot. There wasn't any testimony that in that particular moment, she was trying to protect her car. Um, I think that her testimony is that this, um, argument with continuing where Duffy was, um, you know, you know, beating on the door of Graves apartment, um, and where police aren't arriving. The, the request in the 911 call was to escort, um, Duffy out, um, but where police aren't responding to that. I think, um, I think the, you know, if she were going downstairs to protect her car, she probably would have moved her car rather than re-engage, you know, to try and defuse this argument. It is her cousin. It's not a stranger. Um, so I, again, her testimony is that at the moment that she, um, that they were on the stairs that Duffy was pulling her down, she was, you know, afraid for that. She was in danger of, um, great bodily harm or death. Uh, it wasn't related to the car. I'm not sure if that answered your question, but. Yeah. I mean, I understand it's the question, um, is a little convoluted, but I recall testimony that, uh, she left her apartment because she was concerned that Duffy was, um, talking about, uh, what she was, the damage that she was going to do to the vehicle. And I do think she wanted to, you know, resolve the, resolve the argument perhaps so that there would be no damage, but the, her use of self-defense was because she was in fear of death or great bodily harm. It was not related to, um, property damage. At that moment on the stairs. At the moment on the stairs. Correct. Do either of my colleagues have any additional questions? Okay. That concludes our oral arguments. I want to thank you both. Uh, you did an excellent job. This is a difficult case. It would not be at the appellate court if it was an easy case. So, uh, you've done a great job and, um, I commend you. Uh, you both have a thick skin because we didn't take it easy on you. Uh, but, you know, we, um, are going to take all of your arguments, uh, under advisement. And we'll, uh, issue a ruling, um, soon. Thank you so much. Be well.